UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLEAN AIR COUNCIL, et al.**,<br><br>Plaintiffs,<br><br>v.<br><br>**MICHAEL S. REGAN, in his official capacity as Administrator, U.S. Environmental Protection Agency**,<br><br>Defendant. | Case No. 23-cv-2672 (CRC) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Clean Air Council, Environmental Integrity Project, and PennFuture petitioned the Environmental Protection Agency ("EPA") to object to a Clean Air Act permit issued to a steel factory located in Pennsylvania. Although the EPA advised them that a response to the petition was imminent, Plaintiffs filed suit challenging the agency's failure to respond within the statutory deadline. The Court dismissed the case as moot following the EPA's issuance of the response five days after the complaint was filed. Plaintiffs now move for approximately $82,000 in attorney's fees and costs, claiming their suit catalyzed the agency to act. Disagreeing, the Court will deny the motion

### I. Background

The Clean Air Act allows concerned citizens to file petitions raising "objections" to Clean Air Act Title V permits and requires the EPA to respond to each complaint "within 60 days after the petition is filed." 42 U.S.C. § 7661d(b)(2). In actuality, given the time-intensive task of investigating each petition, coordinating across offices to ensure consistency, engaging various constituency groups, and receiving sign-off from the agency's top brass, the EPA often does not meet this statutory deadline. See Opp'n, Ex. 1 ("Mathias Decl.") ¶¶ 8–14. Indeed, the

Director of the agency's Air Quality Policy Division ("AQPD"), Scott Mathias, submitted a declaration in the present action averring that EPA's "average response time for a petition raising complex issues . . . is approximately 6 months from the time EPA begins work." Id. ¶ 13. This case fits that bill.

On March 6, 2023, Plaintiffs filed an administrative petition with the EPA objecting to an operating permit for the Clairton Coke Works facility in Pennsylvania. See Compl., Ex. 1. Their petition included 10 claims, each with multiple subparts, which the EPA was required to analyze and respond to in a detailed written order. See id.

Wasting no time, the EPA began its review of the petition the following day. Mathias Decl. ¶ 15. In doing so, it followed its standard process of investigating the petition's factual allegations as well as the "legal, policy, and technical" issues presented. Id. ¶¶ 8, 13. It first reviewed Plaintiffs' petition, alongside a related petition filed by the Group Against Smog and Pollution, and then reached out to the agency's Office of General Counsel, Office of Enforcement and Compliance Assurance, and the relevant regional field office to convene a workgroup. Id. ¶ 15. One week later, the AQPD project lead performed a more probing review of the petition and, on May 18, circulated a draft order to the workgroup for review. Id. "The workgroup completed its review of the draft order on June 6, 2023, and on the same day AQPD initiated management review for the representative workgroup offices." Id. ¶ 16.

Despite this diligent response, the 60-day statutory deadline soon passed. So, on July 11, in accordance with 42 U.S.C. § 7604(b)(1)(A), Plaintiffs sent the EPA a notice of intent to sue ("NOI") at the close of another 60 days if the EPA still had not acted upon their petition by then. Id. ¶ 16; Fee Mot., Ex. 2 at 4. That same day, "EPA staff contacted [Plaintiffs] via telephone . . . to confirm receipt of the notice and inform [them] that EPA staff had completed preparing the

2

draft order and that the draft order was currently under management review, which was followed by a brief email confirming receipt of the notice." Mathias Decl. ¶ 16. The EPA followed up with a further status update on August 16, informing Plaintiffs that the draft order was still under management review. Id. In the meantime, the EPA continued to shepherd the draft order through its internal review process. Two weeks later, a final draft order was circulated to the Office of Air and Radiation ("OAR"). Id. ¶ 17. And, on September 11, the EPA updated Plaintiffs that "the draft order [had] moved to the Agency's senior leadership" and "should be close to signature," though the agency could not "say precisely when that [would] happen." Fee Mot., Ex. 2 at 1. Seemingly unsatisfied, Plaintiffs decided to make good on their NOI by filing this lawsuit the next day, alleging that the EPA had failed to perform its mandatory duty under the Clean Air Act to respond to their petition within 60 days. See Compl.

The EPA, meanwhile, continued its ongoing review of the petition. The following day, OAR sent the draft response order to the Office of the Executive Secretariat "for preparation for the Administrator's review and signature." Mathias Decl. ¶ 17. On September 18, five days after the commencement of this suit, the Administrator signed the response order, which granted Plaintiffs' petition on nearly every claim. See id.; Fee Mot. at 3 & n.2. But the EPA's release of the final order did not end the proceedings; it instead prompted another dispute.

Three days after issuing the signed order, the EPA emailed Plaintiffs informing them it had issued the order and requesting that they voluntarily dismiss their complaint as moot. See Opp'n at 3. Plaintiffs declined, demanding that the parties first settle the matter of attorney's fees and costs. See Fee Mot. at 5. The EPA rejected this counterproposal because, from its vantage, Plaintiffs were not entitled to fees or costs under the Clean Air Act because the lawsuit played no role in the final order. See Opp'n at 3; id., Ex. 3. Hearing no further response, the

EPA moved to dismiss the case. The Court granted that motion while retaining jurisdiction over any subsequent fee motions. See Minute Order, December 1, 2023. As expected, one month later, Plaintiffs filed the pending motion for attorney's fees and costs.

## II. Legal Standards

Section 304(d) of the Clean Air Act directs district courts to "award costs of litigation (including reasonable attorney and expert witness fees) . . . whenever the court determines such award is appropriate." 42 U.S.C. § 7604(d). For the award of attorney's fees to be appropriate, a plaintiff must either receive a favorable final judgment or show their lawsuit was a "catalyst" for the relevant agency action. Sierra Club v. EPA, 322 F.3d 718, 726–27 (D.C. Cir. 2003). In determining whether the plaintiff's lawsuit was the "catalyst" for agency action, courts in this jurisdiction employ the "three thresholds test" by considering whether (1) "the claim was colorable rather than groundless"; (2) "the lawsuit was a substantial rather than an insubstantial cause of the defendant's change in conduct"; and (3) "the defendant's change in conduct was motivated by the plaintiff's threat of victory rather than threat of expense." Id. at 727 (quoting Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S. 598, 610 (2001)).[1]

---

[1] This version of the "three thresholds test" comes from the majority opinion in Buckhannon. Plaintiffs advance an alternative formulation, derived from the Buckhannon dissent and quoted in Sierra Club, which looks to whether (1) "the defendant provided 'some of the benefit sought' by the lawsuit"; (2) "the suit stated a genuine claim, i.e., one that was at least 'colorable,' not 'frivolous, unreasonable, or groundless'"; and (3) the "suit was a 'substantial' or 'significant' cause of defendant's action providing relief." Sierra Club, 322 F.3d at 727 (quoting Buckhannon, 532 U.S. at 627–28). Recognizing that majority opinions (not dissents) are the proper place to look for binding legal authority, courts in this District have employed the former version. See Conservation Force v. Salazar, 753 F. Supp. 2d 29, 33 (D.D.C. 2010), aff'd, 699 F.3d 538 (D.C. Cir. 2012); Am. Lands All. v. Norton, 525 F. Supp. 2d 135, 143 n.5 (D.D.C. 2007). This Court will follow that approach. Yet, because both tests turn on whether the lawsuit was a substantial cause of the agency's action, the exact structure of the inquiry does not affect the ultimate outcome here.

4

### III. Analysis

Plaintiffs contend they are entitled to attorney's fees and costs under the "catalyst theory" because they obtained all the relief they sought from the EPA as a result of filing this action. See Fee Mot. at 10–11. However, their claim stumbles at the latter two of the "three thresholds" because the timeline clearly shows that Plaintiffs' lawsuit was not "a substantial . . . cause of the [EPA's] change of conduct" and does not suggest that any "change in conduct was motivated by [Plaintiffs'] threat of victory." Id. at 727.[2]

Plaintiffs' chief argument on causation is one of temporal proximity. They emphasize that the EPA released the response order five days after they filed their complaint and highlight the D.C. Circuit's remark in Sierra Club that "[t]he temporal sequence of plaintiff's litigation followed by defendant's remedial activity [was] strong evidence of a causal relationship." Id. (citation omitted). They also note that, in several cases where the EPA changed course after a petitioner had filed suit seeking to enforce a statutory deadline, the agency conceded that the petitioners had substantially caused the shift in conduct and contested only the reasonableness of the requested fees. See Sierra Club v. McCarthy, 235 F. Supp. 3d 63, 65–66 (D.D.C. 2017); Rocky Mountain Clean Air Action v. Johnson, No. 06-cv-1992 (JR), 2008 WL 1885333, at *1 (D.D.C. 2008). Applying those principles, Plaintiffs contend that the fact the response order was issued just days after this action commenced conclusively proves that this litigation substantially caused the EPA to release the order. See Fees Mot. at 9–10; Reply at 2–3. The Court disagrees.

---

[2] The EPA also contends that the Plaintiffs' motion for attorney's fees and costs is untimely under Federal Rule of Civil Procedure 54(d)(2) and Local Civil Rule 54.2 because it was filed outside the standard 14-day window. See Opp'n at 4–5. Because Plaintiffs appear to have acted in good faith reliance on their request for a 30-day period to file their motion for attorney's fees and costs, see ECF No. 7, and because the Court will deny their motion on the merits regardless, the Court will grant their pending motion for leave to file, see ECF No. 12.

Although temporal proximity is certainly a relevant factor for teasing out causation, it is by no means dispositive in every case. After all, the D.C. Circuit has "caution[ed] against the *post hoc ergo propter hoc* fallacy." Pub. Citizen Health Rsch. Grp. v. Young, 909 F.2d 546, 550 (D.C. Cir. 1990). Heeding this advice, the Court rejects the suggestion that mere temporal proximity seals the deal here. Instead, a foray through the timeline of this case demonstrates that Plaintiffs' lawsuit was *not* the catalyst for the EPA's release of the response order.

As detailed above, the EPA acted diligently in processing Plaintiffs' petition. It began reviewing the petition immediately upon receipt and soon thereafter circulated a draft order to the cross-office workgroup. See Mathias Decl. ¶ 15. From there, the EPA kept Petitioners apprised of its steady progress. In July, it informed them that agency staff had "completed preparing the draft order" which was "currently under management review." Id. ¶ 16. And then on September 11, it updated Plaintiffs that the draft order had "moved to the Agency's senior leadership" and "should be close to signature." Fee Mot., Ex. 2 at 1. Lo and behold, this prediction proved accurate: The Administrator signed the response order six days later. Matthias Decl. ¶ 17. That order came roughly six months after Plaintiffs initially filed their petition—which is longer than the statutory 60-day deadline, but on pace with the EPA's typical processing time for complex petitions such as this one. Id. ¶ 13. Based on this timeline, the Court is unconvinced that Plaintiffs' decision to file suit in between the EPA's email informing them that the order was awaiting signature and when the Administrator signed the dotted line six days later "substantially caused" the EPA to change course. Rather, it appears the EPA continued marching down the same path it was already on. Had Plaintiffs taken the EPA at its word, rather than rush to court, there is every indication they would have received precisely the relief they sought in the exact same timeframe without the need for costly litigation. Nor is there

6

any reason to believe the EPA was motivated by fear that Plaintiffs would prevail in this lawsuit. The EPA instead appears to have acted in the ordinary course, as it steadily pushed the petition through the proper agency channels.

This case is therefore akin to Conservation Force v. Salazar, 916 F. Supp. 2d 15 (D.D.C. 2013), which dealt with a similar issue of attorney's fees in the closely analogous context of the Endangered Species Act. There, the plaintiffs had filed a citizen suit challenging the Fish and Wildlife Service's ("FWS") failure to conduct a mandatory 12-month finding and five-year review of the Canadian wood bison's status under the Endangered Species Act. Id. at 20. Though the FWS took the requested action six months after the suit was filed, the agency communicated that it had started its review more than a year before the case had commenced and was a few months short of its anticipated completion date when the plaintiffs lodged their complaint. Id. at 20–22. On that record, the court found that the "[p]laintiffs [had] failed to meet their burden of demonstrating a causal link between this suit and [FWS's] actions" because "[t]he wheels had been set in motion months before [the] suit was filed." Id. at 21. Because the plaintiffs knew that the relief they sought was imminent, the court concluded that the "suit was a safety net that never needed to be employed." Id.; accord Nat. Res. Def. Council, Inc. v. Norton, No. 02-cv-3187 (LAP), 2003 WL 22232895, at *4–5 (S.D.N.Y. Sept. 29, 2003) (holding in the ESA context that plaintiffs, who filed suit despite knowing that the agency was in the final stages of providing the requested relief, "failed to prove causation sufficient to warrant a fee award"). So too here.

Plaintiffs also argue that they should be compensated for their litigation expenses simply because the EPA violated its nondiscretionary duty under the Clean Air Act to respond to their petition within 60 days. See Reply at 2–4. Certainly, the fact that the EPA did not comply with

7

the 60-day deadline provided a basis for Plaintiffs to proceed in court. See Sierra Club v. Wheeler, 330 F. Supp. 3d 407, 416–17 (D.D.C. 2018).  But the mere fact that the agency missed this deadline and then took the requested action after Plaintiffs filed suit does not prove Plaintiffs are entitled to attorney fees because it skips over the central issue in this case: causation.  Cf. Terris, Pravlik & Millian, LLP v. Ctrs. for Medicare & Medicaid Servs., 794 F. Supp. 2d 29, 38 (D.D.C. 2011) ("Congress did not enact the fee-shifting provision . . . to punish agencies for their slowness in processing . . . requests, but to reward plaintiffs whose filing of lawsuits alters the government's slowness and brings about disclosure.").  This same fact pattern often arises in the FOIA context, which shares a "catalyst" test for fee eligibility.  Time and again, courts in this jurisdiction have held that an agency's failure to respond by the statutory deadline and subsequent release of the requested records during litigation do not entitle plaintiffs to attorney's fees if the agency exercised diligence in processing the request and would have released the documents in due course had the plaintiff not sued.  See, e.g., Env't Integrity Project v. EPA, 316 F. Supp. 3d 320, 325 (D.D.C. 2018) ("If an unavoidable delay accompanied by due diligence in the administrative processes was the actual reason for the agency's failure to respond to a request, it cannot be said that the complainant substantially prevailed in [its] suit." (quotation marks omitted)).  Those principles apply equally here.

   Accordingly, because Plaintiffs have not proven that their lawsuit was the catalyst for the EPA's issuance of the response order, they are not entitled to attorney's fees and costs under the Clean Air Act.

## IV. Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 12] Plaintiffs' Motion for Leave to File is GRANTED; it is further

**ORDERED** that [Dkt. No. 9] Plaintiffs' Motion for Attorney's Fees and Costs is DENIED.

**SO ORDERED**.

This is a final appealable Order.

CHRISTOPHER R. COOPER
United States District Judge

Date: April 16, 2024